# United States Court of Appeals
## For the First Circuit

---

Nos. 03-1803
    03-1804
    03-1992

UNITED STATES OF AMERICA,
Appellee,

v.

ARCADIO DIAZ-DIAZ,
GABRIEL SANTOS-RODRIGUEZ,
EDGAR M. MEDINA-SANCHEZ,
Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before

Lipez, Circuit Judge,
Coffin, Senior Circuit Judge,
and Carter,* Senior District Judge.

---

Juan M. Masini-Soler, for appellant Diaz-Diaz, Rafael Anglada-Lopez, for appellant Santos Rodriguez, and Nicolas Nogueras, Jr., for appellant Medina-Sanchez.
Nelson Perez-Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, were on brief for appellee.

---

December 28, 2005

---

*Of the District of Maine, sitting by designation.

**CARTER, Senior District Judge**. In this case we are again called upon to review convictions resulting from an FBI investigation of corrupt police officers engaged in the protection and transport of narcotics in the Commonwealth of Puerto Rico.[1] This appeal is brought by three co-defendants convicted on charges stemming from a conspiracy to provide police protection for cocaine shipments. Defendants-Appellants Santos-Rodriguez (hereinafter "Santos") and Medina-Sanchez (hereinafter "Medina") were both police officers at the time of the offenses. A jury convicted all three defendants of conspiring to distribute in excess of five (5) kilograms of cocaine, in violation of 21 U.S.C. § 846. Defendants Diaz-Diaz (hereinafter "Diaz") and Santos were also convicted of carrying firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(a)(I). The district court sentenced Diaz to a prison term of 295 months. Santos received a sentence of 248 months of imprisonment. A prison sentence totaling 235 months was imposed on Medina. All three defendants also received a supervised release term of five years.

In this appeal defendants allege a variety of errors, both at trial and sentencing. At trial, the district court is alleged to

_____

[1] Our previous cases arose from a reverse sting operation entitled "Honor Perdido". See United States v. Sanchez-Berrios, 424 F.3d 65, 71 (1st Cir. 2005); United States v. Villafane-Jimenez, 410 F.3d 74, 78 (1st Cir. 2005); United States v. Vazquez Guadalupe, 407 F.3d 492, 494 (1st Cir. 2005); United States v. Flecha-Maldonado, 373 F.3d 170, 172 (1st Cir. 2004).

have committed error by: (1) admitting video recordings of meetings between the defendants and the government's cooperating witness; (2) refusing to grant a mistrial after the prosecutor made improper comments to the jury; (3) failing to, sua sponte, instruct the jury concerning the defense of entrapment; and (4) denying defendant Diaz's motion for judgment of acquittal on the firearm charge. At sentencing, the district court is alleged to have committed error by: (1) improperly delegating its authority to the probation officer; (2) applying the four-level "Organizer or Leader" enhancement to Diaz's sentence; (3) denying Diaz's request for a two-level adjustment for "Acceptance of Responsibility"; (4) denying Diaz's request for a downward departure due to his health condition; and (5) sentencing the defendants in violation of United States v. Booker.[2]

## I.   Factual Background

The evidence presented at trial stems from an FBI "sting" operation.  In October of 2000, Santiago Enmanuel De Leon Lasala (a/k/a "Avanti") approached the FBI seeking to serve as an informant.  The FBI agents told Avanti that they were interested in police officers who served in protective roles for drug smuggling operations.  Avanti, posing as a drug trafficker, attempted to find officers willing to perform such duties.  Eventually, Avanti met

---

[2] Booker, --- U.S. ---, 125 S. Ct. 738 (2005), was decided after sentencing occurred in this case.

-3-

defendant Diaz. Diaz told Avanti that he had police officers on his payroll willing to escort and protect cocaine shipments.

In order to get Diaz to produce these officers, undercover FBI agents posed as members of the drug trafficking cartel. On December 6, 2000, with the assistance of Avanti, Diaz met with an undercover FBI agent, whom he believed to be a member of the cartel. Diaz offered to provide police officers to escort a shipment of cocaine for the cartel. In this and subsequent meetings with the undercover agent, Diaz negotiated the details of the arrangement. Diaz recommended the route to be used in transporting the cocaine from Fajardo to San Juan. Diaz also negotiated the fee that he and his officers would receive, ultimately agreeing on $5,000 per person.

In order to obtain evidence of the defendants' participation in the conspiracy, the FBI, with the assistance of Avanti, arranged a covert system of surveillance. Using FBI provided funds, Avanti rented a storefront from which he taught music lessons. The FBI outfitted this music school with hidden cameras, microphones, and recording devices. Although the devices could be monitored from an outside location by FBI agents, operation of the system was left in the hands of Avanti. Avanti activated the devices by operating a switch on the exterior of the building before entering it to meet with the defendants. After the meetings were over, he could turn off the devices by using the switch when exiting.

On April 27, 2001, Diaz introduced Avanti to defendants Santos and Medina. This meeting took place at the music school and was recorded. The same men met again on June 4, 2001, to finalize plans for transporting the shipment of cocaine. This too was recorded at the music school.

On June 5, 2001 the defendants traveled to the Fajardo Mall. Medina and Santos each entered a separate unlocked vehicle, retrieved the keys from beneath the floor mat, and drove the cars to San Juan. Although the defendants believed that these vehicles contained cocaine, each vehicle contained ten kilograms of flour wrapped in duct tape. As the defendant police officers drove the cars filled with the flour, Diaz followed them in another vehicle.

After completing the transport, the defendants returned to the music school to receive their payment. While waiting there with Avanti, they were again recorded. The cameras recorded Santos removing a revolver from his waistband. The devices also recorded defendant Diaz's statement "He's armed, I'm armed, and he's armed," referring to his co-conspirators.

## II. Analysis

Each defendant raises challenges to his conviction and subsequent sentence.

**A.    Challenges to Convictions**

    1.   Defendant Medina

Medina argues that his conviction must be vacated because the evidence upon which the jury found him guilty was obtained illegally.  Prior to trial, Medina moved to suppress recorded conversations between himself, his co-conspirators, and the government's paid informant, Avanti, on the grounds that they were obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures, and Title III of the Omnibus Crime Control and Safe Streets Act's prohibition on electronic surveillance, 18 U.S.C. § 2510 *et seq*.  That motion was denied and the recorded conversations were admitted at trial.

In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error, and the district court's legal conclusions de novo.  United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003).

On the facts presented in this case, the Fourth Amendment challenge clearly fails.  The Fourth Amendment does not protect an individual from having his or her conversation recorded with the consent of another person who is a party to the surveilled conversation.  Lopez v. United States, 373 U.S. 427, 438-39 (1963).  In such instances, such devices are used "only to obtain the most reliable evidence possible of [the] conversation."  Id.  Although in some instances the use of devices may raise concerns of an

"unlawful physical invasion of a constitutionally protected area," id., no such concerns are raised by police actions in this case. Cf. United States v. Padilla, 520 F.2d 526, 527 (holding that electronic devices planted in defendant's hotel room used to record conversations with federal agents violated Fourth Amendment). Here the electronic monitoring took place in a business controlled by the government's cooperating witness. Defendant's use of the premises was limited to his connection with the underlying conspiracy, thus tailoring the use of electronic monitoring to meetings relevant thereto. This connection was narrowed further by the fact that control of the devices was given to Avanti, not the government, thus ensuring that each conversation monitored was both related to the conspiracy and consented to by the cooperating witness. Consequently, admission of the tapes did not violate defendant's Fourth Amendment rights and there was no error.

Defendant's claim that the recordings violated Title III is, for similar reasons, without merit. As this court has previously recognized, "Congress, in its wisdom, chose to insert a myriad of exceptions and restrictive definitions into Title III, purposely leaving certain...communications unprotected." Griggs-Ryan v. Smith, 904 F.2d 112, 116 (1st Cir. 1990); see also 18 U.S.C. § 2511(1) (prohibiting intentional interception and disclosure "[e]xcept as otherwise specifically provided"). One such

exception, 18 U.S.C. § 2511(2)(c), applies to this case and provides:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c).

Thus, we have held that "[t]he statute permits the taping of conversations without approval if a person who is a party to the conversation gives prior consent." United States v. Font-Ramirez, 944 F.2d 42, 47 (1st Cir. 1991).

Defendant does not contend that Avanti failed to consent to the taping of the conversations. Instead, he attempts to challenge the effect of that consent by arguing that Avanti's relationship with the government was of such a nature that he became an "agent" of the government, as opposed to a "cooperating witness." With respect to application of this statute, however, defendant has provided only a distinction without a difference. Were we to classify Avanti as a government agent it would make no difference, as the statute applies to those who act "under color of law." See 18 U.S.C. § 2511(2)(c). The statute does not distinguish a "cooperating witness" from a "government agent." Accordingly, the consent of Avanti was sufficient to bring the recordings admitted at trial within the above referenced exception, and there was no error in allowing their admission.

-8-

Medina next argues that his conviction should be vacated because of improper remarks made by the prosecutor during defendant's closing argument. Defense counsel, during his closing argument, commented upon the government's failure to call one of the FBI agents as a witness, rhetorically asking:

> ...by the way, have you before you the most important agent of all, Agent Louis Feliciano, the case agent? He was, from the very start, he can explain a lot of things, he can clarify many doubts. He was in charge of the case all throughout. Does it matter at all to you that or it doesn't matter?

In response to this line of argument, the government objected and, in the presence of the jury, stated:

> Your Honor, counsel can call this witness as well.

After the court asked the prosecutor to repeat his objection, he stated in the presence of the jury:

> Counsel can call this witness, just like the United States.

The defendant's attorney timely objected and moved for a mistrial. Although the motion was denied, the judge promptly instructed the jury that defendant had no obligation to present evidence and that the burden of proof remained on the government.[3]

---

[3] The entire instruction was as follows: My instruction to you is this: I told you from the beginning of the case when we were selecting the jury, and I tell you now, I told you in my preliminary instructions when you were a jury, and I tell you now, that the burden of proof is on the government to prove every single element of the offense charged – in this case there are two – that burden has to be met as to each count and each defendant separately. The defendants have no obligation whatsoever to present

Defendant now argues that the district judge should have granted his motion for a mistrial. We review denial of a motion for a mistrial for an abuse of discretion. United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994).

The first question presented is whether the prosecutor's statements were improper. Defendant argues that they were improper because they shifted the burden of proof by insinuating to the jury that the defendant had the burden to present evidence of his innocence. He does not argue, and appears to have no basis on which to do so, that the prosecutor's statements were an improper comment on the defendant's failure to testify.

We have previously held that a prosecutor is not entirely forbidden from commenting on the defendant's failure to produce evidence supporting the defendant's stated theory. See United States v. Kubitsky, 469 F.2d 1253, 1255 (1st Cir. 1972) (prosecutor may "comment upon the absence of witnesses other than the defendant, such as alibi witnesses, that might have been logically expected"). Nonetheless, we have recognized that a prosecutor may cross the line by arguing to the jury that the defendant is obligated to present evidence of his innocence. See United States v. Roberts, 119 F.3d 1006, 1015 (1st Cir. 1997) (finding impermissible argument where prosecutor argued "the defendant has

evidence. The burden of proof lies on the government from beginning to end. This is the end of the case, that burden remains with the United States.

-10-

the same responsibility [as the government] and that is to present a compelling case"). The distinction is one of degree, and for that reason we have warned that "a prosecutor who attempts to define exactly the edge of the precipice approaches at his peril." United States v. Hooker, 541 F.2d 300, 307 (1st Cir. 1976) (internal quotations omitted).

After reviewing the prosecutor's remarks and the context in which they were made, we find that they were improper. Defense counsel's argument was not aimed at having the jury draw the inference that the government did not call the agent because his testimony would have been harmful to its case. Instead, the argument was that the government had failed to present all of the evidence needed to prove Medina guilty beyond a reasonable doubt. In this context, the prosecutor's comments could have the effect of shifting the burden of proof, rather than refuting a requested inference and, therefore, were improper.

The question remains, however, whether the district judge abused her discretion in refusing to grant a mistrial. We conclude that she did not. The prosecutor's remark, though technically improper, approached the margin of propriety. Moreover, any risk that the jury may have improperly considered the remark was immediately and effectively addressed by the judge's prompt and thorough instruction to the jury that the burden of proof remained with the government. See United States v. Smith, 145 F.3d 458, 462

-11-

(1st Cir. 1998) (stating that courts "must presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case, and that they follow those instructions")(citations omitted). Accordingly, we will affirm the denial of defendant's motion for a mistrial.

   2.   Defendant Santos

Santos argues that his conviction must be overturned because it was the result of entrapment.  The first issue to be resolved is whether this court may consider defendant's entrapment argument even though he failed to raise it before the district court.  This court has long held that "an issue not raised before the trial court cannot be raised for the first time on appeal."  United States v. Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991) (quoting United States v. Figueroa, 818 F.2d 1020, 1025 (1st Cir. 1987)).  Although defendant concedes that he did not "formally" raise the issue below, he argues that there was some evidence at trial that his commission of the illegal acts resulted from improper inducement by law enforcement officials.  Hence, his challenge before this court is, in essence, that the evidence presented at trial "raised the issue" and required the district court to instruct the jury, sua sponte, on the entrapment defense.

At least one circuit has concluded that there is no such affirmative duty on the part of the district court to give an

entrapment instruction absent a request from the defendant. See United States v. Lewis, 987 F.2d 1349, 1354 (8th Cir. 1993) (holding that defendant waived entrapment defense by not raising it prior to submission of the case to the jury). That question, however, need not be resolved here because defendant was not entitled to the instruction.

Before an entrapment instruction may be given to the jury, the defendant bears the "entry level" burden of pointing to "hard evidence, which if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit." United States v. Young, 78 F.3d 758, 760 (1st Cir. 1996) (internal quotations omitted). This requires evidence on both elements of the defense, specifically, "(1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." United States v. Sanchez-Berrios, 424 F.3d 65, 76 (1st Cir. 2005) (quoting United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988)). If a defendant fails to make the requisite showing of either government inducement or lack of predisposition, he is not entitled to the instruction.

Defendant in this case is unable to make any showing that government actors improperly induced him into these offenses. As this court has made clear, it is not sufficient that the government

-13-

provided the defendant with the opportunity to commit the crime. A defendant must demonstrate an opportunity "plus" some other conduct, such that it implicates concerns of government overreaching. See Young, 78 F.3d at 761. On this issue defendant points only to the promise of $5,000 for his services in escorting the drug shipment, which he argues "is a lot of money for a minimum salary municipal police officer in Puerto Rico." The promise of financial gain, however, even if significant, is insufficient to demonstrate government inducement. See Sanchez-Berrios, 424 F.3d at 76 ("The only inducement that the record reflects is a chance to make money--and holding out the prospect of illicit gain is not the sort of government inducement that can pave the way for an entrapment defense."); United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987) (explaining that a person is not improperly induced when he "succumbs to his own greed or to the lure of easy money"). Because defendant failed to meet his burden as to improper inducement, the entrapment defense instruction was not warranted.

### 3. Defendant Diaz

Diaz argues that there was insufficient evidence presented to the jury to justify his conviction for the firearm offense. Because Diaz moved for a judgment of acquittal at the close of all the evidence, he has preserved the issue for appeal. See United States v. Van Horn, 277 F.3d 48, 54 (1st Cir. 2002). Thus, the court reviews the issue de novo, to determine if, viewing all the

-14-

evidence in the light most favorable to the government and taking all reasonable inferences in its favor, a rational factfinder could find the defendant guilty beyond a reasonable doubt on all elements of the offense. See United States v. Grace, 367 F.3d 29, 34 (1st Cir. 2004).

On appeal the government does not argue that Diaz physically possessed a firearm himself, but rather that he is vicariously liable for the firearm offense under a theory of Pinkerton liability. See Pinkerton v. United States, 328 U.S. 640, 647-48 (1946). Accordingly, we first consider if sufficient evidence was admitted that the offense was committed by one of the defendant's co-conspirators, and then consider if there was sufficient evidence for the jury to find Diaz vicariously liable for that conduct.

In order to prove that a co-conspirator committed the crime of carrying a firearm in relation to a drug trafficking offense, the government had the burden to prove that: (1) the co-conspirator committed the predicate drug trafficking crime...; (2) that the co-conspirator knowingly carried or used a firearm; and (3) that the co-conspirator did so during and in relation to the specified predicate offense. See United States v. Flech-Maldonado, 373 F.3d 170, 179 (1st Cir. 2004). As to the first element, there can be no doubt that there was sufficient evidence to prove that Santos and Medina conspired with Diaz to traffic in cocaine. Indeed,

defendant Diaz does not challenge his own conviction for having conspired with them to do so.

The second element was also satisfied, as the government presented a video recording showing defendant Santos brandishing a firearm while the group was waiting for payment at the music school. Finally, the third element was satisfied because there was evidence that this firearm was brandished both during and in relation to the conspiracy. At the time the firearm was observed the conspiracy was still ongoing, as the co-conspirators were seeking to obtain their payment. Furthermore, a reasonable jury could find, beyond a reasonable doubt, that the carrying of that firearm was in relation to that conspiracy because the evidence showed that the co-conspirator's role in escorting the cocaine was to provide protection. Thus, the government provided sufficient evidence that a co-conspirator committed the firearm offense.

In order for defendant Diaz to be held vicariously liable for this conduct, however, the government must also prove that the carrying of the firearm was in furtherance of the conspiracy, and that this act was foreseeable by the defendant. See Pinkerton, 328 U.S. at 647-48. On these points the evidence was overwhelming. The government admitted recordings of Diaz himself assuring an undercover FBI agent "we're going [to be] armed over there, and we're going to shoot at everything that moves." This, coupled with the fact that the object of the conspiracy was the protection of

-16-

the cocaine shipment, leaves no room for doubt that the carrying of the firearm was in furtherance of that conspiracy. Finally, the defendant's statement shows that he in fact believed that his co-conspirators would be armed during the escort of the cocaine. Viewing this evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence for a reasonable jury to find defendant Diaz guilty on a theory of vicarious liability.

**B.    Sentencing**

Defendant Diaz

Diaz challenges the terms of his supervised release, arguing that the district court erred in delegating to the probation officer the authority to determine the number of drug tests he will be subject to and whether, upon a positive result, he must engage in a rehabilitation program. It is clearly established law in this circuit that such delegations are improper, e.g., United States v. Melendez-Santana, 353 F.3d 93, 101-03 (1st Cir. 2003), and on this point the government concedes error.

The question before the court, then, is whether that portion of the sentence must be vacated due to the error. Recently, a panel of this court, sitting en banc, clarified that unpreserved delegation errors of this type remain subject to traditional "plain error review." See United States v. Padilla, 415 F.3d 211, 220 (1st Cir. 2005). Consequently, because defendant was afforded an

opportunity to object to the conditions he now challenges, but failed to do so, this court will apply a plain error test to determine if the error warrants reversal.

Under the plain error standard applicable to delegation errors the defendant must "limn circumstances indicating a reasonable probability that the trial court, but for the error, would have imposed a different, more favorable sentence." Id. at 221. As this court has recognized, such a demonstration of prejudice in cases involving this type of error is almost impossible. Id. Nonetheless, the court has carefully reviewed the record before it for any such indication. Having found none, we conclude that defendant has failed to make the requisite showing of prejudice.

Defendant Diaz next challenges the trial judge's determination that he was subject to an enhancement as an "organizer or leader" pursuant to U.S.S.G. § 3B1.1(a). This court may only review that determination for clear error. United States v. Laboy, 351 F.3d 578, 585 (1st Cir. 2003).

The guidelines provide that such an enhancement is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Thus, in order to apply the enhancement the sentencing court must determine that the defendant had both the requisite participation in the criminal activity, and that the criminal activity itself was sufficiently extensive. See

id.  Here Diaz challenges only the determination that his participation was sufficient for the enhancement to apply.

The Guideline comments provide "relevant factors" for determining whether or not the requisite participation exists, specifically:

> exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

The evidence at trial demonstrated that Diaz's conduct satisfies many of the above listed criteria.  The trial court was justified in finding that he had, after promising that he could provide corrupt police officers to protect a cocaine shipment, actively recruited Police Officers Santos and Medina.  The record also supports the conclusion that Diaz's participation continued to a large degree.  Evidence showed that he attended most of the meetings in which the amount of shipments of cocaine and transportation of the cocaine were discussed.  Diaz even instructed the undercover agents of the best route for transporting the drugs.  Although he did not receive a larger share of the "fruits of the crime," Diaz exercised some decision-making authority as he was the one who made contact with the undercover agents to negotiate what payment he and his accomplices would receive.  Finally, after recruiting the officers, assisting in the planning, and negotiating

-19-

the fee, Diaz personally oversaw the transport of the sham cocaine by traveling with his accomplices on the route he had helped choose. On this record it cannot be said that the trial judge committed clear error.

For similar reasons this court will affirm the district court's denial of Diaz's request for a downward adjustment for "Acceptance of Responsibility," pursuant to U.S.S.G. § 3E1.1(a). First, we note that a defendant who takes his case to trial "greatly diminishe[s] his chances of receiving [such an] adjustment." United States v. Baltas, 236 F.3d 27, 37 (1st Cir. 2001). We need not address, however, whether this case presents one of the few circumstances in which a defendant may still receive the adjustment, because the record simply does not support Diaz's contention that he ever accepted responsibility for his commission of the crimes.

As evidence of his acceptance of responsibility, defendant points to his objection to the pre-sentence report, in which his counsel asserted:

> It is represented that Mr. Diaz fully accepts his responsibility as he now understands that his decision to go to trial was due to his perception that he was somehow legitimately assisting or helping the cooperating witness (Avanti).

Although this statement purports to be an acceptance of responsibility, it is nothing of the sort. Rather than admitting that he committed the crimes alleged, Diaz admits only the conduct

and denies the <u>knowledge</u> that makes it a crime. The record shows that even at sentencing Diaz continued this denial. During the sentencing hearing, defendant's counsel asserted that defendant still maintained that, rather than having been involved in criminal conduct, he had been aiding the government informant in order to assist the federal government.[4] There is nothing in this record which demonstrates that defendant ever took responsibility for any of his criminal conduct.[5] Consequently, refusal of the downward adjustment was not clear error.

The district court's refusal to grant defendant a downward departure due to his health condition is also affirmed. In reviewing the denial of a departure request this court's review is limited to whether the sentencing judge misconstrued its authority. <u>United States</u> v. <u>Mejia</u>, 309 F.3d 67, 70 (1st Cir. 2002). Thus,

---

[4] Counsel stated;
Mr. Diaz was firmly convinced that he was somehow aiding the United States government through Mr. Avanti, and that he thought he had an agreement with Mr. Avanti, that Mr. Avanti would explain to the federal government, the federal agents everything that was going on.

[5] Defendant's attempt to blame the probation officer for failing to give him an opportunity to confess his responsibility is unavailing. In his meeting with the probation officer, it was defendant who chose to remain silent regarding the criminal conduct because his attorney was not present. Furthermore, this was not the only opportunity for defendant to disclose his acceptance of responsibility, as he could have submitted an affidavit to the court prior to sentencing. Finally, defendant himself exercised his right to address the court at sentencing and chose to omit any statement accepting responsibility. Any failure to record the alleged acceptance of responsibility falls squarely upon defendant.

> we review de novo a district court's determination of its authority to depart, but lack jurisdiction to review a discretionary decision not to depart from the Sentencing Guidelines.

Id.

The record before us indicates that the sentencing judge did not misconstrue her authority. During sentencing the court correctly told counsel that a downward departure could be granted if the defendant could make a showing that he would be unable to receive adequate treatment while serving his sentence with the Bureau of Prisons (hereinafter "BOP"). This is a proper statement of the district court's authority under the sentencing guidelines. See United States v. Martin, 363 F.3d 25, 50 (1st Cir. 2004) (affirming downward departure where defendant made showing that he could not receive adequate treatment from BOP). Indeed, defendant does not here contend that the district court misconstrued its authority, but rather that it erred by not permitting him an opportunity to gain additional medical examinations in order to present the true extent of his illness. As the district court pointed out during sentencing, however, the examinations requested by defendant would have been of no assistance to the court because the persons by whom he wished to be examined had no apparent knowledge of the treatment services available within the BOP. Accordingly, the district court did not err in the refusal of defendant's request for a downward departure.

## C.   **Booker** Error

Because all three of the defendants were sentenced under the pre-Booker mandatory guidelines, we review to determine if we must vacate any or all of the sentences.  The government stipulates to error as to each sentence, but argues that we must affirm because there has been no resulting prejudice.

The first step in our inquiry is to determine who bears the burden of persuasion on the issue of prejudice.  This turns on whether the defendants below "preserved" the error by objecting to the sentence.  In considering claims of Booker error we have been somewhat lenient, construing any objection argued on the basis of Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), or general constitutional grounds, as sufficient to preserve the issue.   See United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005).

With regard to defendants Diaz and Santos, there was no such objection and it is clear that neither has preserved the issue. Accordingly we review their sentences only for plain error, and those defendants bear the burden of demonstrating "a reasonable probability that the district court would impose a different sentence [that is] more favorable to the [defendants] under the new 'advisory Guidelines' Booker regime." Antonakopoulos, 399 F.3d at 75.

-23-

Defendant Medina, on the other hand, did object at sentencing on the grounds that his sentence violated Apprendi. Although the government argues that this objection was only sufficient to "partially preserve" the issue (a distinction that we will address later in our analysis), the government concedes that it bears the burden to show, beyond a reasonable doubt, that the district court would impose the same sentence under the advisory guidelines. See United States v. Vazquez-Rivera, 407 F.3d 476, 489 (1st Cir. 2005).

Having determined the parties' requisite burdens, we turn to the record to decide whether those burdens have been met.

1.   Defendant Santos

In arguing that there is a reasonable probability that the district court would impose a lesser sentence under the advisory guidelines, defendant Santos points only to the fact that he was sentenced to the minimum permitted under the then mandatory guidelines. We have previously held, however, that a sentence at the low end of the guidelines, without more, is insufficient to make the requisite showing under our plain error jurisprudence. United States v. Kornegay, 410 F.3d 89, 99-100 (2005). Finally, we have carefully reviewed the record before us and find nothing that would establish a likelihood of defendant receiving a more favorable sentence under the advisory guidelines. Accordingly, we will affirm the sentence imposed by the district court as to defendant Santos.

-24-

## 2. Defendant Diaz

The record also fails to indicate that there is a reasonable probability that defendant Diaz would receive a more favorable sentence under the advisory guidelines. Like Santos, Diaz was also given the lowest possible sentence under the then existing mandatory guidelines. Unlike Santos, however, the record indicates that Diaz suffers from a serious illness. We have previously recognized that such circumstances may, in some cases, make it more likely that the district court would depart downward under the now advisory guidelines. See United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005). This is not such a case. The record reflects that the district judge carefully considered the defendant's illness in determining his sentence. At no time did she express any concern that the guidelines failed to account for his illness appropriately. On the contrary, the record reflects that the district judge decided that the proper response to the defendant's illness was to recommend that he serve his sentence at a facility which could provide appropriate treatment. There was no error in this. We find nothing in this record indicating that the district judge would do any differently under the advisory guidelines, and therefore we will affirm defendant Diaz's sentence.

## 3. Defendant Medina

As noted above, the government concedes that it bears the burden to show beyond a reasonable doubt, that the district court

would apply the same sentence under the now advisory guidelines. Although we have noted that this is an extremely difficult burden, it is not an impossible one. Vazquez-Rivera, 407 F.3d at 489-90.

The government first argues that all of the sentencing factors relied upon by the district court were supported by overwhelming evidence. The question, however, is not whether the district judge would apply the same factors under the advisory guidelines, but whether she would reach the same sentence based upon those same factors. See Vazquez-Rivera, 407 F.3d at 490 ("factual certainty alone would not be sufficient to show beyond a reasonable doubt that the judge, acting under an advisory Guidelines system, would have applied the same sentence on the basis of those factors"). The government's contention is not supported on this record.

Next, the government asserts that this defendant's "partial" preservation of the Booker error is further evidence that the judge would apply the same sentence under the advisory guidelines. The government labels this a "partial" preservation because defendant Medina objected to only one of the sentencing factors applied by the court. Essentially, the government argues that this is significant because, even if his objection at sentencing had been sustained, he still could have been sentenced under the mandatory guidelines to the same sentence that he ultimately received, 235 months imprisonment. Although this fact may be interesting, we fail to see, and the government has failed to articulate, why it is

significant.  The error in sentencing was not the district court's application of factors requiring judicial factfinding, it was doing so under a mandatory guideline system.  For purposes of determining prejudice, it is the compulsory status of the guidelines that must be proven harmless, and the "partial" preservation claimed by the government bears no logical relation to that question.

Finally, the government argues that a comment made by the judge during sentencing demonstrates that she would apply the same sentence under the advisory guidelines.  Although we have recognized that such comments may be persuasive evidence that the <u>Booker</u> error was harmless, <u>see</u> <u>United States</u> v. <u>Melendez-Torres</u>, 420 F.3d 45, 51-52 (1st Cir. 2005), no comments made by the judge in this case can be interpreted to express such an opinion.

At sentencing, defendant's attorney argued that it was unfair that although defendant was acquitted of the firearm charge, the judge's application of the two-level enhancement for the presence of a firearm would result in his receiving a sentence that was substantially similar to his co-defendants who were convicted of the firearm offense.  In response to this argument, the judge stated that "[c]onviction of the firearms charge would have entailed a consecutive sentence on that charge."  The government appears to argue that this statement demonstrates the judge's belief that the sentence given to defendant Medina was appropriate. We, however, do not so construe it.  The judge's statement to

counsel describing the effect of a conviction for the firearm offense was a correct statement of the applicable law. It contained no statement of belief or opinion, and does not assist the government in meeting its burden.

Finally, we note that there is reason to doubt that defendant would receive the same sentence under the advisory guidelines because the district judge sentenced defendant Medina to the lowest sentence permitted by the then mandatory guidelines.[6] See United States v. Casas, 425 F.3d 23, 61 (1st Cir. 2005) (observing that judge had applied sentence at low end of the guideline range); see also Vazquez-Rivera, 407 F.3d at 490 (stating that "our doubt...is enhanced by the fact that, while the applicable Guidelines constrained the sentencing judge to the upper margin of sentences available under [the relevant statute], the sentence he chose was at the low end of that margin"). On the record before us we are not persuaded beyond a reasonable doubt that the district judge would have applied the same sentence in Medina's case under an advisory guideline regimen.

---

[6] Consideration of this fact with respect to defendant Medina is entirely consistent with our affirmance of the sentences of Diaz and Santos. Although a sentence at the low end of the guideline range is of some relevance in determining the likelihood that the district court would apply the same sentence under the advisory regime, that fact alone is insufficient to make an affirmative showing of prejudice. See Kornegay, 410 F.3d at 99-100. We need not, and do not, attempt to further quantify the relevance of that fact here.

**III. Conclusion**

For the reasons stated above, we <u>VACATE</u> the sentence of defendant Medina and <u>REMAND</u> for his resentencing.  In all other respects, the judgments of conviction and the sentences imposed by the district court are <u>AFFIRMED</u>.